The B. F. GOODRICH COMPANY et al., Petitioners,

v.

DEPARTMENT OF TRANSPORTATION et al., Respondents.

UNIROYAL, INC., et al., Petitioners,

v.

DEPARTMENT OF TRANSPORTATION et al., Respondents.

Nos. 75–1568 and 75–1785.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 16, 1975.

Decided Sept. 2, 1976.

As Amended Sept. 30, 1976.

Rehearing and Rehearing En Banc Denied Oct. 8, 1976.

Patrick F. McCartan, John L. Strauch, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for joint petitioners in both cases.

Charles D. McCarty, Akron, Ohio, for B. F. Goodrich.

Frank Berndt, Acting Chief Counsel, Allan J. Kam, Atty., National Highway Traffic Safety Administration, Dept. of Transportation, Ronald R. Glancz, Richard A. Olderman, App. Section, Civ. Div., Dept. of Justice, Washington, D. C., for respondents in both cases.

Thomas D. Caine, Akron, Ohio, for Goodyear.

Roger F. Golden, Findley, Ohio, for Cooper.

William J. Henrick, Akron, Ohio, for General.

Joseph E. Downs, Akron, Ohio, for Firestone.

George Downing, Cleveland, Ohio, for Mansfield Tire.

Arthur, Dry & Kalish, New York City, Thompson, Weir & Barclay, New Haven, Conn., for petitioners in 75–1785.

Before EDWARDS, LIVELY and ENGEL, Circuit Judges.

EDWARDS, Circuit Judge.

In this case we review a strange record of delay and nonfeasance on the part of administrators charged with enforcing a regularly adopted statute of the United States.

In 1966, after years of legislative consideration, the Congress of the United States adopted and the President signed a bill known as the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. §§ 1381 *et seq.* (1970). Section 203 of that statute provided:

> In order to assist the consumer to make an informed choice in the purchase of motor vehicle tires, within two years after September 9, 1966, the Secretary shall, through standards established under subchapter I of this chapter, prescribe by order, and publish in the Federal Register, a uniform quality grading system for motor vehicle tires. Such order shall specify the date such system is to take effect which shall not be sooner than one hundred and eighty days or later than one year from the date such order is issued, unless the Secretary finds, for good cause shown, that an earlier or later effective date is in the public interest, and publishes his reasons for such finding. The Secretary shall also cooperate with industry and the Federal Trade Commission to the maximum extent practicable in efforts to eliminate deceptive and confusing tire nomenclature and marketing practices.
>
> Pub.L. 89–563, Title II, § 203, Sept. 9, 1966, 80 Stat. 729, 15 U.S.C. § 1423 (1970).

The Act was to become effective in 1968. In fact, the agency charged with formulating the § 203 regulation, the National Highway Traffic Safety Administration, did not promulgate it until May 20, 1975. This regulation finally established effective dates of January 1, 1976, July 1, 1976, and January 1, 1977, for the grading and labeling of radial-ply, bias-belted and bias-ply tires, respectively—ten years after adoption of the statute.[1]

It is not pertinent to our problem of judicial review to assess blame for this procrastination. We note that the agency's

---

1. On August 14, 1975, the Sixth Circuit granted a motion to stay the effective dates pending judicial review.

brief strongly implies that at least some of the delay was due to the hostility of the industry which Congress proposed to regulate. We also note that the assignment of responsibility for administering § 203 has been changed a number of times.[2] It may also be that among the many problems of the United States of America in the last decade, providing reliable information to consumers so that they could make better decisions in buying tires appeared to be a low priority item to those responsible.

Whatever the reasons, it is a sad fact that a law of the land was allowed to lie unheeded until a consumer organization headed by Ralph Nader hailed the agency into a federal court to account for its nonfeasance. *Nash v. Brinegar,* No. 177–73 (D.D.C., May 2, 1974). The regulation now being tested as to legal validity gives every appearance of being adopted somewhat hastily on the heels of the consent decree which terminated that litigation. The consent decree provided for the promulgation (at long last) of a proposed rule on or before June 15, 1974, and a final rule "as expeditiously as possible."

To turn now to the specific facts of this case, Goodrich and seven other major tire companies in two petitions seek review of the validity of a regulation issued May 20, 1975, by the National Highway Traffic Safety Administration establishing uniform tire quality grading standards for pneumatic passenger tires, 49 C.F.R. § 575.104 (1975). The regulation requires grading tires for three performance qualities: treadwear, traction, and temperature resistance. It requires that this information be molded into the tire sidewalls, printed on paper labels affixed to the treads, and kept available in writing by the tire dealer.

## STANDARDS OF REVIEW

Petitioners' first two issues in this case invite us to write a treatise on the applicable standard of review of the administrative regulations under attack herein. We decline the invitation to write exhaustively on this subject since we are convinced that these arguments do not in any event control the results of this case.

Petitioners insist that we employ the "practicable" and "objective terms" language which Congress applied to "motor vehicle safety standards" in § 103(a) of the Act, 15 U.S.C. § 1392(a), and the "substantial evidence" standard of review applicable to formal rule-making under the Administrative Procedure Act, 5 U.S.C. § 706(2)(E) (1970). The agency, on the other hand, insists that the regulations we review herein are not "motor vehicle safety standards" under § 103 of the Act and that they were properly adopted in informal rule-making under 5 U.S.C. § 553 (1970) and that this court must affirm the Administrator, unless his actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1970).

As to this argument, we hold that the procedures employed by the agency were informal rule-making procedures authorized under 5 U.S.C. § 553 (1970). Since we find no statutory language requiring a hearing, we believe that the agency regulation is reviewable under the "arbitrary and

2. The original Act conferred authority to administer it on the Secretary of Commerce, Act of September 9, 1966, Pub.L.No.89–563, §§ 103, 102(10), 80 Stat. 718. By subsequent legislation, Congress transferred all powers under the Act to the Secretary of Transportation, 49 U.S.C. § 1655(a)(6)(A). The Secretary had delegated these powers, with several exceptions not relevant here, to the Federal Highway Administration until March 22, 1970, when they were withdrawn and delegated to the National Highway Safety Bureau, contemporaneously with the Bureau's separation from the Highway Administration and elevation within the Department to the status of an administration, 49 C.F.R. § 1.51, 35 Fed.Reg. 4955. On January 1, 1971, the Bureau was renamed the National Highway Traffic Safety Administration (NHTSA) and the delegations of authority were amended to reflect the change in title 36 Fed. Reg. 430. The current delegation to the Administrator of the NHTSA to administer the Act appears at 49 C.F.R. § 1.51. The authority to issue notices of proposed rulemaking has been redelegated to the Associate Administrator (formerly the Assistant Director) for Motor Vehicle Programs, 35 Fed.Reg. 5118, 36 Fed. Reg. 13994, 49 C.F.R. § 501.8.

capricious" standards set forth in 5 U.S.C. § 706(2)(A) (1970). *See United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). In perhaps an excess of caution, we shall express our view also under the "substantial evidence" standard urged upon us by petitioners and claimed by them to be mandated for this circuit by this court's opinion in *Chrysler Corp. v. Department of Transportation,* 472 F.2d 659 (6th Cir. 1972).

We turn then to consideration of petitioners' claim that the regulations under review are "motor vehicle safety standards" and hence must be reviewed by this court under the language of § 103(a) of the Act, 15 U.S.C. § 1392(a), which follows: [3]

> (a) The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.
>
> 15 U.S.C. § 1392(a) (1970).

Our consideration of the legislative history of this Act shows that in the Senate this legislation originated as two wholly separate bills. One was a general automobile safety law. S. 3005, 89th Cong., 2d Sess. (1966). The other was a consumer protection bill concerned with tire quality grading. S. 2669, 89th Cong., 2d Sess. (1966). The House bill, however, encompassed both subjects. H.R. 13228, 89th Cong., 2d Sess. (1966). After each originating body had passed its bill or bills, the joint Conference Committee saw fit to merge them under one title. This last process may have served to help produce the ambiguity in the final product which plagues us in this appeal. The conferees failed to clarify their conflicting views on the question of wheth-

er the tire quality grading standards are also safety standards.

Section 103(a) of the Act, 15 U.S.C. § 1392(a), upon which petitioners rely for a more restrictive review standard, refers specifically to motor vehicle safety:

> (a) The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.

Section 203, 15 U.S.C. § 1423, on the other hand, provides:

> In order to assist the consumer to make an informed choice in the purchase of motor vehicle tires, within two years after September 9, 1966, the Secretary shall, through standards established under subchapter I of this chapter, prescribe by order, and publish in the Federal Register, a uniform quality grading system for motor vehicle tires.

Legislative history discloses that two of the chief Senate sponsors for the tire grading system made it clear that, to them, the purpose of tire grading had little if any relationship to safety. Senator Magnuson, Chairman of the Commerce Committee, said:

> It should be absolutely clear that the grading system has very little to do with minimum safety standards. Confusion in tire marketing is certainly an irritable and undesirable condition, but it does not involve the safety feature. 112 Cong. Rec. 6915 (1966).

Senator Ribicoff, another sponsor, said:

> There is absolutely no way to know the value you are getting for your money; and while the chairman is absolutely cor-

---

**3.** Petitioners also urge § 103(f)(3) and (4), 15 U.S.C. § 1392(f)(3) and (4), as relevant to the standard of our review. These provisions read as follows:

> (f) In prescribing standards under this section, the Secretary shall—
>
> \* \* \* \* \* \*
>
> (3) consider whether any such proposed standard is reasonable, practicable and ap-

propriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and

> (4) consider the extent to which such standards will contribute to carrying out the purposes of this chapter.

We do not believe that the above provisions add anything of substance to the language of § 103(a) quoted *supra.*

rect, that the grading has nothing to do with minimum safety standards, yet from the consumer's standpoint, I think he should be aware of what type of tire he is getting, and whether he is paying a proper price for it. *Id.*

The House Committee Report, however, took a different point of view:

> Although some have argued that [tire] quality grading is solely an economic problem, the committee is satisfied this is not so and that it has a direct relationship to safety. Standards as to grading are necessary to assure safety. *Grading standards, as well as any other tire standards related to safety, are within the scope of the authority of the Secretary under title I of the bill.* H.R.Rep.No. 1776, 89th Cong., 2d Sess. 33 (1966). (Emphasis added).

For purposes of this case we assume, without finally deciding, that the language of Section 103 is applicable to the instant regulation. Section 203, of course, specifically provides for establishment of the uniform quality grading system "through standards established under subchapter I of this chapter." Subchapter I contains both the section which provides for review by this court (§ 105, 15 U.S.C. § 1394) and the section (§ 103) which provides that motor vehicle safety standards shall be "practicable" and "stated in objective terms." We leave to a future case, where this language might make a critical difference in decision, consideration of the government's argument that the subchapter I standards referred to are those contained in Section 112(d) of the statute, 15 U.S.C. § 1401(d), rather than those contained in Section 103.

Turning now to the merits of this case, we find that petitioners have attacked the agency regulation on every possible front. Their claims include the following:

1. The agency in adopting its Regulation failed to follow the procedures required by the National Traffic and Motor Vehicle Safety Act and by the Administrative Procedure Act.

2. The grading information system required by the regulation is unreasonable, impractical and inconsistent with the Act.

3. The grading standards in the Regulation do not comply with the Act and are not supported by substantial evidence. In particular petitioners claim that traction, treadwear and temperature resistance tests devised by the agency do not correlate with tire performance on the road and do not produce uniform and reliable results.

4. The lead time specified by the Regulation is arbitrary, unreasonable and not supported by substantial evidence.

## THE PROCEDURAL OBJECTIONS

█ We have searched this voluminous record for evidence to support petitioners' complaints of procedural abuses and have found none. As we have already noted, the industry which Congress and the President decided to regulate in this consumer information provision has known for ten years that this form of regulation was coming. Further, the industry has been on notice of the pendency of the instant informal rulemaking proceeding since at least 1971. It has had more than ample opportunity to offer comment and, indeed, the record is full of comment by the Rubber Manufacturers Association and many individual rubber companies.

This said, we recognize that we have not met precisely the procedural objections raised by petitioners. Their claim is that (although they were thoroughly familiar with the agency's proposed informal rulemaking concerning testing by use of control tires [4]) · the agency abruptly shifted to a regulation calling for use of a tire testing ground near San Angelo, Texas, and course monitoring tires for measuring the changes in the course itself caused by weather, temperature or wear. Petitioners also claim that this change was occasioned by

---

4. Under the control tire approach, the candidate tires are graded for treadwear on unspecified courses of the manufacturer's choice. The wear rate of a candidate tire is determined and is then compared to that of a specially constructed "control tire."

the Nader litigation, *Nash v. Brinegar, supra,* to which we have already referred.

We find no reason to invalidate the Regulation or remand it for further proceedings on any of these grounds. As we have indicated, we have no doubt that *Nash v. Brinegar* did help to spur this reluctant dragon into some increased regulatory activity. But, surely, such was needed. In addition, the failure of the industry to produce viable bids for a control tire coincided in time with the *Nash v. Brinegar* litigation. It is this failure which the agency points to as occasioning its abrupt change.

Our examination of this record convinces us that the problems likely to develop from testing tires on the San Angelo course as a result of the use of course monitoring tires will be minor compared to those which would have accompanied control tire testing without a standard course.

More importantly, of course, as to appellants' procedural complaints, our examination of the schedule of published notices indicates that notices were published giving adequate time for industry response. Indeed, industry responses were many and detailed. The first notice of proposed rule-making was published on September 21, 1971. It received considerable negative industry response and was withdrawn on April 21, 1972. The agency then determined that the three consumer information aspects which should be tested were treadwear, traction and high speed performance. A proposed regulation oriented toward these objectives was issued March 7, 1973, and the regulation using the control tire approach was issued as a "final rule" on January 4, 1974. It was withdrawn in May of 1974 after agency advertisement for competitive bids for control tires produced only two proposals, neither of which the agency considered responsive or legal.

Notice 12 which involved the San Angelo course testing approach and the use of a course monitoring tire was published June 14, 1974, with revisions on August 9, 1974. Timely comment on the proposed rule closed on September 12, 1974. At the request of the industry, however, comment upon the whole rule and its revisions was reopened for ten days beginning April 14, 1975, with the agency assurance that comments received after that date would be given full consideration. The rule itself was published May 20, 1975.

We will deal separately under the Grading Standard section of this opinion with petitioners' attacks upon the agency's selection (and failure to select) course monitoring tires. This issue excepted, we are able to find no abuse of informal rule-making in the procedure followed by the agency.

 The industry also asserts that its procedural rights have been abused by the fact that the agency "dumped" documents into the record after the final closing date for public comment. The agency answers that the documents complained about were simply part of the administrative record which had to be prepared for this court as a result of the industry's petition for review. The Administrative Procedure Act does not require that every bit of background information used by an administrative agency be published for public comment. Our review of this issue indicates that it is lacking in merit. The basic data upon which the agency relied in formulating the regulation was available to petitioners for comment.

### THE GRADING INFORMATION SYSTEM

Petitioners attack the grading information system principally upon two grounds. First, they alleged that the information provided is not meaningfully related to safety and "will in many instances be affirmatively misleading." Second, they assert that the informational requirements are unnecessarily and unreasonably expensive and in regard to the paper label requirement, impossible to perform to a satisfactory degree so as actually to reach the consumer.

 Section 203, 15 U.S.C. § 1423, is not primarily a safety law. It is designed, as its language and its history show, primarily to provide information to tire buyers from which they can tell something about the product they are buying. It is related to

safety in the sense that an owner can know whether his tires are good, average or poor in relation to three safety related characteristics.

■ Important industry representatives either proposed or agreed with the three tire characteristics of treadwear, traction and temperature resistance[5] as to which the agency intends to offer information. In this proceeding, although appellants' attack is upon the Regulation as a whole, there is no real dispute about the three tire characteristics which it seeks to measure. Measured by any standard of review to which we have previously referred, there is "ample evidence" in the whole record to require us to uphold the agency's choice of tire characteristics to be measured. *Chrysler Corp. v. Department of Transportation*, 515 F.2d 1053 (6th Cir. 1975).

## MISLEADING INFORMATION

■ Appellants' point concerning possible misleading effect of the information provided does, however, raise a question to which we do not find adequate answers. They assert with regard to temperature resistance information: "There is no qualifying language of any kind which would indicate that the grade is based only on heat resulting from high speed *at proper loads and inflation. . . .*" (Emphasis added.) Obviously a satisfactory grade on temperature resistance is no guarantee against blowouts due primarily to a combination of high speed and either underinflation or excess loading. A simple warning to this effect would seem to be in order. We believe that this issue should be remanded for agency consideration.

■ Similarly appellants note that traction grading is based only upon straight ahead stopping tests. Their claims include the suggestion that "lateral" traction characteristics are likewise important but not covered. The agency's response on this score is that thus far no practical test for lateral traction has been devised and that

the agency is working to devise one. There is no industry response to the contrary. Nonetheless, it may be desirable to point out the traction test's limitation in this regard. We recognize that adding such warnings to the information molded into the tire wall would be highly impractical. But on this record we cannot see any similar impracticality in adding them to the proposed tire labels and dealer (point of sale) information sheets. The issue of warning tire consumers that lateral traction is not covered by the traction test is remanded for consideration by the agency.

By these remands we do not purport to adopt appellants' arguments. Rather, we remand simply because we do not find any adequate answer to them in this record and we feel that they have sufficient public interest merit to require agency review.

## COSTS

Appellants also attack as arbitrary and unreasonable in cost the regulations on informational requirements—particularly that which requires that all tires (except original equipment tires) carry a paper label supplying the required grading information. The record shows that information pertaining to tires is, according to widespread industry practice, currently 1) molded into tire sidewalls, 2) furnished to dealers, and 3) printed on labels pasted to tires. Adding the § 203 information will undoubtedly add some costs—but hardly ones which are beyond the contemplation of Congress when it passed the statute.

The industry's particular attack is centered upon the paper label required to be pasted to each tire. Appellants claim that the paper label requirement will add 15 to 17 million dollars of cost, that the label is impossible to keep affixed to every tire, and that, anyhow, less than a majority of prospective purchasers will ever see the label.

The agency responses include the following paragraphs from the Federal Trade Commission's submission in this record:

---

5. Industry references were to "high speed performance." This record shows that high speed can lead to heat build-up and blowouts.

Finally, the Commission is aware of the sharply divided views in the docket on the subject of paper tread labels. The argument has been raised that the tread label will not be seen by many consumers because the labels are attached to tires which are usually installed in the garage of the tire store. This argument has some merit, but labels on tires which are on display, or on tires purchased without mounting services, will be readily seen by the consumer.

The alternative to the paper tread labels—point of sale materials—would not be as reliable a method of communicating the desired information to the consumer. From an enforcement standpoint, we have been advised that it is beyond the power of NHTSA to require dealers to have point of sale materials available in a conspicuous place; whereas NHTSA has clear authority over requiring labels on tires up to time of sale.

In these circumstances, the Commission would suggest that tread labels be required, although we would encourage tire manufacturers and dealers to use point of sale materials as well.

Additionally, the agency has commented on this topic:

Tread labels are presently used to identify tires throughout the tire industry. If labels should be detached, manufacturers can furnish dealers with replacement labels which they can affix before a tire is sold. *Although the actual tires a motorist purchases may not be seen by him prior to delivery, representative tires are usually displayed in most locations where tires are sold. Such display tires would have labels affixed to their tread surface, and the information would thus be available to purchasers before sale in an obvious and conspicuous location.* (Emphasis added). 39 Fed.Reg. 20810 (1974).

We find these responses to be convincing and supported by "ample evidence" in this record. *Chrysler Corp. v. Department of Transportation,* 515 F.2d 1053 (6th Cir. 1975).

As to petitioners' protests about the cost of the tire labels, it seems obvious to us, as it does to the agency, that full information (as contrasted to the minimum information supplied on the tire wall) can be cheaply provided to the ultimate consumer merely by some expansion of the tire label now in widespread use in the industry. The agency cites a three cent per label cost estimate by Uniroyal for this expansion. Its own estimate as shown in the Inflation Impact Review, parts of which we reproduce as Appendix B to this opinion, gives an overall estimate of five cents per tire for all labeling costs. While we have noted the largely unsupported estimate in petitioners' brief of $17 million cost per year for tire labels, even that figure would produce a per tire cost of only 12-plus cents when adjusted to the 133-plus million tires to which labels would need to be affixed.

■ Thus we find "ample evidence" to support the portion of the agency's Regulation pertaining to grading information and no violation of the standards of § 103 of the Act.

### THE GRADING STANDARDS AND TESTS

Petitioners attack all three grading standards as unrelated to highway safety. As noted above, we have already rejected this argument. Petitioners' heaviest fire, however, is reserved for the test procedures established by the rule for each standard and particularly for the claimed variations in the testing devices which they assert are sufficient to invalidate at least the traction and treadwear tests.

The agency has provided a summary of the grading standard and tests established by the Uniform Tire Quality Grading Standard Rule:

#### Treadwear

Treadwear grades are based on a tire's projected mileage (the distance which it is expected to travel before wearing down to its treadwear indicators) as tested on a single, predetermined test run of approximately 6400 miles. The test course has been established by the agency

in the vicinity of San Angelo, Texas. The course is approximately 400 miles long, and each treadwear test will require 16 circuits. A tire's tread depth is measured periodically during the test and, then, based upon these measurements, its projected mileage is calculated. A tire's treadwear grade is expressed as the percentage which its projected mileage represents of a nominal 30,000 miles,* rounded off to the nearest lower 10% increment. For example, a tire with a projected mileage of 24,000 would be graded "80," while one with a projected mileage of 40,000 would be graded "130."

The treadwear performance of a candidate tire is measured along with that of course monitoring tires (CMTs) of the same construction type (bias, belted bias, or radial) that are used to monitor changes in course severity. The CMTs are tires procured by the agency for purchase and use at the test site. The CMTs are manufactured in a single production lot at a single plant. Therefore, the CMTs are more homogeneous than tires bought at random.

Each test convoy consists of one car equipped with four CMTs and three or fewer other cars equipped with candidate tires of the same construction type. Candidate tires on the same axle are identical, but front tires on a test vehicle may differ from rear tires as long as all four are of the same size designation. After a two-circuit break-in period, the initial tread depth of each tire is determined by averaging the depth measured at six equally spaced locations in each groove. At the end of every two circuits (800 miles), each tire's tread depth is measured again, tires are rotated, and wheel alignments are readjusted if necessary. At the end of the 16-circuit test, each tire's overall wear rate is calculated from the nine measured tread depths and their corresponding mileages after break-in by using the regression line technique described in the Preambles to Notices 15 and 17.

### Traction

Traction performance in the grading procedure relates to the ability of a tire to stop (or decelerate) a motor vehicle on a wet roadway. This ability to stop a vehicle is dependent on the frictional forces developed at the tire-pavement interface. The frictional force relates to the resistance to sliding of the tire over the pavement; a large frictional force developed at the tire-pavement interface, therefore, indicates that the motor vehicle will be stopped quickly and in a short distance on that pavement. Low friction and hence poor traction degrades a tire's traction on wet surfaces. In traction testing for tires and pavements, the measurement of the frictional force developed at the tire-pavement interface is expressed in terms of coefficients of friction, or skid numbers (SN), and is measured utilizing a two-wheeled skid trailer.

Traction testing using the skid trailer has in recent years become standardized. The RMA has noted that "locked wheel braking traction as measured by a skid trailer has received the most attention and [that] generally acceptable testing methods have been published (e. g., ASTM E274–70 and SAE J345a)." The tire industry, as well as highway engineers, have adopted the skid trailer for the measurement of traction. Indeed, the RMA commented that the proposed utilization of the test methods and equipment for the grading of traction performance was generally acceptable with some modifications. (*Id.*)

Agency sponsored research in 1967 demonstrated that a tire which performs well on one surface does not necessarily perform well on another surface. In subsequent research to select appropriate surfaces, four pavements typical of most roadways surfaces in the United States were tested. A fifth and atypical surface, representing bleeding asphalt, was also studied. Bleeding asphalt is a very slippery surface when wet and was esti-

---

* This is in accord with what the RMA "strongly recommend[ed], the use of a treadwear rating system that will indicate relative performance on a percentage basis."

1188

mated to comprise only 5 percent or less on the total roadway surfaces in the United States. Of the five surfaces studied, three were asphalt, one concrete, and one was asphalt coated with clay-filled tar emulsion to simulate bleeding asphalt. Because the three asphalt surfaces gave skidding results that were highly correlated, the agency was able to eliminate two asphaltic surfaces, since the results on the remaining one would apply generally to all three. The bleeding asphalt was atypical, and therefore it was decided to employ one asphalt and one concrete surface to correlate with most road conditions. Traction grading results obtained on these two surfaces installed at the San Angelo facility will enable the consumer to make an informed choice with respect to traction.

Contrary to their new "litigation position" (PB 57, PB 20), the Petitioners had proposed that the grading procedure for traction be based on the test results from *one* surface. Petitioner B. F. Goodrich has indicated that the proposed surface with a wet coefficient of 0.50 be eliminated because accidents occur more frequently on smooth roads characterized by a 0.30 wet coefficient. (Supp. App. 12). In addition, Petitioner Firestone commented that the NHTSA evaluation test on the test pads constructed at San Angelo will indicate little, if any, advantage to the use of two different test surfaces, and recommended that the test procedure include only the one skid pad which gives the best and most consistent results. The agency rejected this pre-litigation proposal of Petitioners since such a grading scheme would lead the consumer to believe that the tire found to be best on a single grading pavement would be best on all other pavements. The traction grading procedure specified in the Rule requires that candidate tires be tested on two surfaces. The highest traction grade will be assigned only to the tires that achieve the highest rating on *both* surfaces. This practice will insure that a tire given the highest traction grade will

indeed perform better on most surfaces than another tire with a lower grade.

### Temperature Resistance

The third performance characteristic measured by the final Rule is named "temperature resistance" rather than "high speed performance" as in previous NPRMs. Sustained high temperature can cause the material of the tire to degrade and reduce tire life, and excessive temperature can lead to sudden tire failure. Therefore, the Rule provides for three grades of temperature resistance which are believed to be meaningful to the consumer. This characteristic is measured by pressing the tire against a laboratory test wheel which is rotated at successively higher speeds. A grade of "C" corresponds to the minimum requirements of FMVSS 109 (the long existing standard with which all newly manufactured tires must comply), which requires successful completion of the 425 rpm test stage. Grade "B" indicates that the tire has successfully completed the 500 rpm test stage, and "A" the 575 test rpm stage.

Our examination of this record shows "ample evidence" to uphold the test procedures summarized above under the headings of Temperature Resistance and Traction. In both instances test equipment widely recognized in industry, as well as in government safety testing, is employed.

It should be observed that we have approached petitioners' arguments about the testing devices and procedures with full realization that no measuring devices yet made by man are perfect. The fact that moisture and heat affect the accuracy of the household yardstick would help make it useless in a die shop. But these minor variations are hardly grounds for eliminating this generally reliable tool from normal household use. We recognize that every reasonable effort should be made by the agency to assure the accuracy of the grades assigned to tires under the three selected standards. But clearly no test procedures designed to grade millions of tires are going to approach perfection.

Section 203 of the Act conveys no governmental power to ban the sale of any tire no matter how low it scores on the tests ultimately employed. The primary impact of this regulation upon the industry will undoubtedly be that the lower the tire grade, the lower the price the public is likely to pay for it in a competitive market. This situation calls for reasonably fair and reasonably reliable grading procedures, not theoretical perfection. These we find to have been fully employed in relation to the temperature resistance and traction tests outlined in the Rule (*See* Appendix A) and accurately summarized above.

 We likewise find no reason to disturb the agency's decision to change from treadwear testing using control tires employed on many different test tracks under a wide variety of physical circumstances and operators to the use of the single test track operated by the agency at San Angelo, Texas, described in the Rule. *See* Appendix A. The record supports the agency's conclusion that many variables will thus be eliminated and a closer approach to standard and repeatable testing of treadwear will thus be made possible.

## COURSE MONITORING TIRES

The agency and petitioners are, however, in agreement on at least one proposition, namely, that when the candidate tires [6] are tested, course monitoring tires should be run over the same course at the same time in the same convoy in order to allow for correction of any variances in the treadwear characteristics of the course itself. As the length of the yardstick varies with heat and moisture, so the friction of the San Angelo course pavement will vary depending on whether it is hot or cold, wet or dry, newly laid or much worn.

This record supports the employment of course monitoring tires as contemplated by the Rule. We likewise conclude that ample evidence supports the agency plan to procure course monitoring tires by careful selection of industry tire brands purchased in single lots in each tire construction category —bias, bias belted and radial. The agency indicates that each lot purchased will have been built by one operator and subject to rigid material and quality controls with coefficients of variation below 5%.

Much of petitioners' briefing, however, is devoted to an issue which we find it impossible to resolve on this record. They attack with great vigor the adequacy and accuracy of the testing of the one course monitoring tire (radial) which had been chosen as of the time this record was closed. They point out that they have not had an opportunity to comment in this record upon the bias and bias belted CMTs which the agency's brief indicates have now been chosen.

It appears that the agency had (as of the close of this record) run two tests upon its selected radial course monitoring tire. The agency, however, relied upon only one of the tests (T–1014) and that test the agency concedes produced unsatisfactory results in terms of variations. These the agency asks that we ignore as due to some unnamed vehicle malfunction.

 While we recognize that course monitoring tires (like the yardstick) cannot be perfectly accurate, we believe the industry is entitled to know that all three of the course monitoring tires have been tested with results which meet the agency's own standards—standards which we have approved above. We also believe that when the agency seeks to rely, as it does concerning the radial CMT, upon only one test for a CMT that it cannot claim its result is supported by ample evidence or its choice is other than arbitrary when that test is admittedly flawed by a problem not clearly identified or explained on this record.

As to this issue, the case is remanded to the agency for completion of the testing and selection of the three course monitoring tires, or if this has already been fully and satisfactorily accomplished, for reopening of the record for inclusion of the results and for a brief period of industry comment thereon. Without intending to interfere

---

**6.** Candidate tires are those supplied by the industry for grading.

with agency discretion in this regard we would deem 30 days to be ample.

## THE LEAD TIME

■ Petitioners also assert that the "lead times" provided for implementation of this regulation by the industry (basically 18 months) are impossible for it to achieve. This argument is based primarily upon the contention that the test facilities at San Angelo which the agency contemplates furnishing will not be able to accomplish the agency testing within the lead times specified. The agency's response to this argument is summarized below:

Using the RMA's estimate of 9,500 total domestic tire types and 1,400 total foreign tire types (III App. 932) or a total of 10,900 tire types, and testing a judiciously selected 40 percent sample of tire size-line combinations (see Wallace affidavit, paragraph 7), 4,360 tire types must be tested during the initial 18 months.

The agency recognized that during the first six months of testing for radial tires there may be some new designs phased in toward the end of that period, and accordingly allowed a contingency factor of 15% to cover this transition period. (This is approximately the number chosen by many of Petitioners' affiants in support of the stay motion.) The agency also made an allowance of 5% for test time required by the agency's enforcement testing, and an allowance of 20% for vehicle breakdown, accidents, maintenance, and adverse weather.

Using the course to its maximum capacity, 15,000 tire types can be graded in 18 months, whereas only 6,318 tire types need to be tested, even making allowances for the aforementioned contingencies. Thus, the course needs to be used to only 42% of its capacity to implement the Rule's treadwear grading schedule. In essence the agency has demonstrated that, based upon the reasonable assumptions presented above, and allowing for all reasonable contingencies, there is a large "safety factor" for treadwear testing.

This means that unforeseen contingencies of a magnitude of 2.4 times the total time allowed can be handled. Stated in other terms, it indicates that the number of vehicles per shift could be reduced from 400 to 200 (the number given in the revised E.I.A.), or the sample of candidate tires could be increased from 4 to 8, and still meet the proposed implementation schedule (if no unforeseen contingencies arise).

(2) Traction Implementation Schedule.

The traction test circuit is long enough (1.4 miles) to permit the safe operation of 10 trailers at one time. To make a conservative estimate, however, the agency based its calculation on only 7 trailers operating at one time. The capacity of the course for traction testing averages 5 candidate tires per day and 7 trailers can feasibly operate at one time. Hence, the course is capable of grading an average of 35 tires per day.

Making allowances of 20% for trailer downtime, which is in agreement with expressed testimony of all of Petitioners' affidavits in support of the stay motion, and 2% for the agency's enforcement testing, as well as 15% for transient design changes during the first testing period, the agency found that 10,021 tire types could be graded in 18 months. Using the RMA's estimate of approximately 9500 total domestic tire types and 1400 total foreign tire types (III App. 932), there are a total of approximately 10,900 tire types. As with treadwear testing, it is the judgment of the agency's experienced personnel that testing 4 tire sizes judiciously selected from an average of 10 tire sizes per line is sufficient to provide reasonable extrapolation for rating of all sizes. (Wallace affidavit, paragraph 2, Supp.App. 87, Opp.App. 43; Dugoff, Brenner and Scheiner affidavit, paragraph 26i, Supp.App. 79). Therefore, 4360 tire types must be tested during the initial 18 months. Thus, a required efficiency use of the skid pads of only 43.5% is necessary to test one sample of each required tire type for traction.

The agency has demonstrated that, based upon the reasonable assumptions presented above, and allowing for all reasonable contingencies, there is also a large "safety factor" for traction testing.

This means that unforeseen contingencies of a magnitude of 2.3 times the total time allowed can be handled. Stated in other terms, it indicates that two samples of each required tire type could be tested for traction instead of one, and the proposed implementation schedule could still be met, if no major unforeseen contingencies arise, because there is a large "safety factor."

In fact, these calculations are conservative, as shown by a Society of Automobile Engineers technical paper authored by representatives of Petitioners General, Uniroyal, Goodyear, and Firestone. That paper reported that traction performance varies insignificantly from size to size within a line. (Record, N4–48(a)). While the agency's calculations are based on the assumption that manufacturers would test 4 tire sizes selected from an average of 10 tire sizes per line, this technical paper shows that testing of only one size per line is probably sufficient.

There is "ample evidence" in the record to support these conclusions. *Chrysler Corp. v. Department of Transportation,* 515 F.2d 1053 (6th Cir. 1975). We do not, however, pretend to choose between the absolutely conflicting evidence presented on this score by petitioners and the agency. That decision is one which is committed to the administrative agency concerned subject to limited review by this court.

The responsibility of meeting the test course break-in and operating problems will fall not on the industry but on the agency. Obviously, if the dire predictions of petitioners prove true, the agency can meet the problem by amending the Rule and temporarily (or permanently) reducing the number of tires to be tested in each tire size line or by extending the lead time. We note from its brief that the agency clearly intends to exercise such discretion in order to meet the delay occasioned by this litigation:

Should the Rule be upheld, the agency will consider extending these implementation dates in order to take into account the effect of the stay ordered by the Court on August 14, 1975.

In accordance with what we have said above, with the two exceptions noted, we approve the disputed agency Rule entitled Uniform Tire Quality Grading Standards, 49 C.F.R. § 575.104 (1975). The approval is based upon our review of the entire record and represents our considered judgment that all aspects of the rule which we approve were supported by substantial evidence and were not the product of arbitrary or capricious agency action.

Further, our approval is based upon our belief that the Rule is fully supported when reviewed under the standards set forth in Section 103 of the Act.

Those portions of the Rule which deal directly with information to be printed on tire labels and point of sale information sheets and which deal directly with course monitoring tire selection and testing are hereby remanded to the respondent agency for further consideration in accordance with this opinion's comments under the headings of MISLEADING INFORMATION and COURSE MONITORING TIRES.

No costs are awarded.

## APPENDIX A

§ 575.104 Uniform tire quality grading standards.

(a) *Scope.* This section requires motor vehicle and tire manufacturers and tire brand name owners to provide information indicating the relative performance of passenger car tires in the areas of treadwear, traction, and temperature resistance.

(b) *Purpose.* The purpose of this section is to aid the consumer in making an informed choice in the purchase of passenger car tires.

(c) *Application.* This section applies to new pneumatic tires for use on passenger cars manufactured after 1948. However, this section does not apply to deep tread, winter-type snow tires.

(d) *Requirements*—(1) *Information.* (i) Each manufacturer of tires, or in the case of tires marketed under a brand name, each brand name owner, shall provide grading information for each tire of which he is the manufacturer or brand name owner in the manner set forth in paragraphs (d)(1)(i)(A) and (d)(1)(i)(B) of this section. The grades for each tire shall be only those specified in paragraph (d)(2) of this section. Each tire shall be able to achieve the level of performance represented by each grade with which it is labeled. An individual tire need not, however, meet further requirements after having been subjected to the test for any one grade.

(A) Each tire shall be graded with the words, letters, symbols, and figures specified in paragraph (d)(2) of this section, permanently molded into or onto the tire sidewall between the tire's maximum section width and shoulder in accordance with one of the methods described in Figure 1.

(B) Each tire, except a tire sold as original equipment on a new vehicle, shall have affixed to its tread surface in a manner such that it is not easily removable a label containing its grades and other information in the form illustrated in Figure 2. The treadwear grade attributed to the tire shall be either imprinted or indelibly stamped on the label adjacent to the description of the treadwear grade. The label shall also depict all possible grades for traction and temperature resistance. The traction and temperature resistance performance grades attributed to the tire shall be indelibly circled.

(ii) In the case of information required in accordance with § 575.6(c) to be furnished to prospective purchasers of motor vehicles and tires, each vehicle manufacturer and each tire manufacturer or brand name owner shall as part of that information list all possible grades for traction and temperature resistance, and restate verbatim the explanations for each performance area

specified in Figure 2. The information need not be in the same format as in Figure 2, but must indicate clearly and unambiguously the grade in each performance area for:

(A) In the case of a vehicle manufacturer, each tire offered for sale on a new motor vehicle; and

(B) In the case of a tire manufacturer or brand name owner, each tire of that manufacturer or brand name owner offered for sale at the particular location.

(iii) In the case of information required in accordance with § 575.6(a) to be furnished to the first purchaser of a new motor vehicle, each manufacturer of motor vehicles shall as part of that information list all possible grades for traction and temperature resistance and restate verbatim the explanation for each performance area specified in Figure 2. The information need not be in the format of Figure 2, but must clearly and unambiguously indicate the quality grades for the tires with which the vehicle is equipped.

(2) *Performance*—(i) *Treadwear.* Each tire shall be graded for treadwear performance with the word "TREADWEAR" followed by a number of two or three digits representing the tire's grade for treadwear, expressed as a percentage of the NHTSA nominal treadwear value, when tested in accordance with the conditions and procedures specified in paragraph (e) of this section. Treadwear grades shall be multiples of 10 (e. g., 80, 150).

(ii) *Traction.* Each tire shall be graded for traction performance with the word "TRACTION," followed by the symbols 0, *, or ** (either asterisks or 5-pointed stars) when the tire is tested in accordance with the conditions and procedures specified in paragraph (f) of this section.

(A) The tire shall be graded 0 when the adjusted traction coefficient is either:

(*1*) 0.38 or less when tested in accordance with paragraph (f)(2) of this section on the

asphalt surface specified in paragraph (f)(1)(i) of this section, or

(*2*) 0.26 or less when tested in accordance with paragraph (f)(2) of this section on the concrete surface specified in paragraph (f)(1)(i) of this section.

(B) The tire may be graded * only when its adjusted traction coefficient is both:

(*1*) More than 0.38 when tested in accordance with paragraph (f)(2) of this section on the asphalt surface specified in paragraph (f)(1)(i) of this section, and

(*2*) More than 0.26 when tested in accordance with paragraph (f)(2) of this section on the concrete surface specified in paragraph (f)(1)(i) of this section.

(C) The tire may be graded ** only when its adjusted traction coefficient is both:

(*1*) More than 0.47 when tested in accordance with paragraph (f)(2) of this section on the asphalt surface specified in paragraph (f)(1)(i) of this section, and

(*2*) More than 0.35 when tested in accordance with paragraph (f)(2), of this section on the concrete surface specified in paragraph (f)(1)(i) of this section.

(iii) *Temperature resistance.* Each tire shall be graded for temperature resistance performance with the word "TEMPERATURE" followed by the letter A, B, or C, based on its performance when the tire is tested in accordance with the procedures specified in paragraph (g) of this section. A tire shall be considered to have successfully completed a test stage in accordance with this paragraph if, at the end of the test stage, it exhibits no visual evidence of tread, sidewall, ply, cord, innerliner or bead separation, chunking, broken cords, cracking or open splices as defined in § 571.109 of this chapter, and the tire pressure is not less than the pressure specified in paragraph (g)(1) of this section.

(A) The tire shall be graded C if it fails to complete the 500 rpm test stage specified in paragraph (g)(9) of this section.

(B) The tire may be graded B only if it successfully completes the 500 rpm test stage specified in paragraph (g)(9) of this section.

(C) The tire may be graded A only if it successfully completes the 575 rpm test stage specified in paragraph (g)(9) of this section.

(e) *Treadwear grading conditions and procedures*—(1) *Conditions.* (i) Tire treadwear performance is evaluated on a specific roadway course approximately 400 miles in length, which is established by the NHTSA both for its own compliance testing and for that of regulated persons. The course is designed to produce treadwear rates that are generally representative of those encountered in public use for tires of differing construction types. The course and driving procedures are described in Appendix A to this section.

(ii) Treadwear grades are evaluated by first measuring the performance of a candidate tire on the government test course, and then correcting the projected mileage obtained to account for environmental variations on the basis of the performance of course monitoring tires of the same general construction type (bias, bias-belted, or radial) run in the same convoy. The three types of course monitoring tires are made available by the NHTSA at Goodfellow Air Force Base, San Angelo, Texas, for purchase by any persons conducting tests at the test course.

(iii) In convoy tests each vehicle in the same convoy, except for the lead vehicle, is throughout the test within human eye range of the vehicle immediately ahead of it.

(iv) A test convoy consists of no more than four passenger cars, each having only rear-wheel drive.

(v) On each convoy vehicle, all tires are mounted on identical rims: either a "test rim" as defined with respect to that tire in paragraph S3 of Standard No. 109 (§ 571.-109 of this chapter) which is of the width listed for the applicable tire size designation under the words "test rim width" in Table I of the Appendix to Standard No. 109, or such a "test rim" having a width within —0 + 0.50 inches of the width listed.

(2) *Treadwear grading procedure.* (i) Equip a convoy with course monitoring and candidate tires of the same construction type. Place four course monitoring tires on one vehicle. On each other vehicle, place four candidate tires with identical size designations. On each axle, place tires that are identical with respect to manufacturer and line.

(ii) Inflate each candidate and each course monitoring tire to an inflation pressure 8 pounds per square inch less than its maximum permissible inflation pressure.

(iii) Load each vehicle so that the load on each course monitoring and candidate tire is 85 percent of the load specified in Appendix A of § 571.109 of this chapter (Standard No. 109) at the inflation pressure specified in paragraph (e)(2)(ii) of this section.

(iv) Adjust wheel alignment to that specified by the vehicle manufacturer.

(v) Subject candidate and course monitoring tires to "break-in" by running the tires in convoy for two circuits of the test roadway (800 miles). At the end of the first circuit, rotate each vehicle's tire by moving each front tire to the same side of the rear axle and each rear tire to the opposite side of the front axle.

(vi) After break-in, allow the tires to cool to the inflation pressure specified in paragraph (e)(2)(ii) of this section or for two hours, whichever occurs first. Measure, to the nearest 0.001 inch, the tread depth of each candidate and course monitoring tire, avoiding treadwear indicators, at six equally spaced points in each groove. For each tire compute the average of the measurements. Do not include those shoulder grooves which are not provided with treadwear indicators.

(vii) Adjust wheel alignment to the manufacturer's specifications.

(viii) Drive the convoy on the test roadway for 6,400 miles. After each 800 miles:

(A) Following the procedure set out in paragraph (e)(2)(vi) of this section, allow the tires to cool and measure the average tread depth of each tire;

(B) Rotate each vehicle's tires by moving each front tire to the same side of the rear axle and each rear tire to the opposite side of the front axle.

(C) Rotate the vehicles in the convoy by moving the last vehicle to the lead position. Do not rotate driver position within the convoy.

(D) Adjust the wheel alignment to the vehicle manufacturer's specifications, if necessary.

(ix) Determine the projected mileage for each candidate tire as follows:

(A) For each course monitoring and candidate tire in the convoy, using the average tread depth measurements obtained in accordance with paragraph (e)(2)(vi) of this section and the corresponding mileages as data points, apply the method of least squares as described in Appendix C to this section to determine the estimated regression line of y on x given by the following formula:

$$y = a + \frac{bx}{1000}$$

Where:

y = average tread depth in mils,

x = miles after break-in,

a = y intercept of regression line (reference tread depth) in mils, calculated using the method of least squares; and

b = the slope of the regression line in mils of tread depth per 1,000 miles, calculated using the method of least squares. This slope will be negative in value. The tire's wear rate is defined as the absolute value of the slope of the regression line.

(B) Average the wear rates of the four course monitoring tires as determined in accordance with paragraph (e)(2)(ix)(A) of this section.

(C) Determine the course severity adjustment factor by dividing the base wear rate for the course monitoring tire (see note below) by the average wear rate for the four course monitoring tires determined in accordance with paragraph (e)(2)(ix)(B) of this section.

Note: The base wear rates for the course monitoring tires will be furnished to the purchaser at the time of purchase.

(D) Determine the adjusted wear rate for each candidate tire by multiplying its wear rate determined in accordance with paragraph (e)(2)(ix)(A) of this section by the course severity adjustment factor determined in accordance with paragraph (e)(2)(ix)(C) of this section.

(E) Determine the projected mileage for each candidate tire using the following formula:

$$\text{Projected mileage} = \frac{1000\,(a-62)}{b'} + 800$$

Where:

$a$=y intercept of regression line (reference tread depth) for the candidate tire as determined in accordance with paragraph (e)(2)(ix)(A) of this section.

$b'$=the adjusted wear rate for the candidate tire as determined in accordance with paragraph (e)(2)(ix)(D) of this section.

(F) Compute the percentage of the NHTSA nominal tread-wear value for each candidate tire using the following formula:

$$P = \frac{\text{Projected Mileage}}{30,000} \times 100$$

Round off the percentage to the nearest lower 10 percent increment.

(f) *Traction grading conditions and procedures* —(1) *Conditions.* (i) Tire traction performance is evaluated on skid pads that are established, and whose severity is monitored, by the NHTSA both for its compliance testing and for that of regulated persons. The test pavements are asphalt and concrete surfaces constructed in accordance with the specifications for pads "C" and "A" in the "Manual for the Construction and Maintenance of Skid Surfaces," National Technical Information Service No. DOT–HS–800–814. The surfaces have locked wheel traction coefficients when evaluated in accordance with paragraphs (f)(2)(i) through (f)(2)(vii) of this section of 0.50 ± 0.10 for the asphalt and 0.35 ± 0.10 for the concrete. The location of the skid pads is described in Appendix B to this section.

(ii) The standard tire is the American Society for Testing and Materials (ASTM) E 501 "Standard Tire for Pavement Skid Resistance Tests."

(iii) The pavement surface is wetted in accordance with paragraph 3.5, "Pavement Wetting System," of ASTM Method E 274–70, "Skid Resistance of Paved Surfaces Using a Full-Scale Tire."

(iv) The test apparatus is a test trailer built in conformity with the specifications in paragraph 3, "Apparatus", of ASTM Method E 274–70, and instrumented in accordance with paragraph 3.3.2 of that method, except that "wheel load" in paragraph 3.2.2 and tire and rim specifications in paragraph 3.2.3 of that method are as specified in the procedures in paragraph (f)(2) of this section for standard and candidate tires.

(v) The test apparatus is calibrated in accordance with ASTM Method F 377–74, "Standard Method for Calibration of Braking Force for Testing of Pneumatic Tires" with the trailer's tires inflated to 24 psi and loaded to 1085 pounds.

(vi) Consecutive tests on the same surface are conducted not less than 30 seconds apart.

(vii) a standard tire is discarded in accordance with ASTM Method E 501.

(2) *Procedure.* (i) Prepare two standard tires as follows:

(A) Condition the tires by running them for 200 miles on a pavement surface.

(B) Mount each tire on a "test rim" as defined in paragraph S3 of Standard No. 109 (§ 571.109 of this chapter) which is of a width within —0 + 0.50 inches of the width listed for the applicable tire size designation under the words "test rim width" in Table I of the Appendix to Standard No. 109. Then inflate the tire to 24 psi.

(C) Statically balance each tire-rim combination.

(D) Allow each tire to cool to ambient temperature and readjust its inflation pressure to 24 psi.

(ii) Mount the tires on the test apparatus described in paragraph (f)(1)(iv) of this section and load each tire to 1085 pounds.

(iii) Tow the trailer on the asphalt test surface specified in paragraph (f)(1)(i) of this section at a speed of 40 m p h, lock one trailer wheel, and record the locked-wheel traction coefficient on the tire associated with that wheel between 0.5 and 1.5 seconds after lockup.

(iv) Repeat the test on the concrete surface, locking the same wheel.

(v) Repeat the tests specified in paragraphs (f)(2)(iii) and (f)(2)(iv) of this section for a total of 10 measurements on each test surface.

(vi) Repeat the procedures specified in paragraphs (f)(2)(iii) through (f)(2)(v) of this section, locking the wheel associated with the other tire.

(vii) Average the 20 measurements taken on the asphalt surface to find the standard tire traction coefficient for the asphalt surface. Average the 20 measurements taken on the concrete surface to find the standard tire traction coefficient for the concrete surface.

(viii) Prepare two candidate tires of the same construction type, manufacturer, line, and size designation in accordance with paragraph (f)(2)(i) of this section, ·mount them on the test apparatus, and test one of them according to the procedures of paragraphs (f)(2)(ii) through (v) of this section,

except load each tire to 85 percent of the load specified at 24 psi for the tires' size designation in Appendix A of Standard No. 109 (§ 571.109 of this chapter). Average the 10 measurements taken on the asphalt surface to find the candidate tire traction coefficient for the asphalt surface. Average the 10 measurements taken on the concrete surface to find the candidate tire traction coefficient for the concrete surface.

(ix) Compute a candidate tire's adjusted traction coefficient for asphalt ($u_a$) by the following formula:

$u_a$ = Measured candidate tire coefficient for asphalt $+0.50$
— Measured standard tire coefficient for asph...

(x) Compute a candidate tire's adjusted traction coefficient for concrete ($u_c$) by the following formula.

$u_c$ = Measured candidate tire coefficient for concrete $+0.35$
— Measured standard tire coefficient for concrete

(g) *Temperature resistance grading.* (1) Mount the tire on any test rim as defined in S3 of Standard No. 109 (§ 571.109 of this chapter) and inflate it to 2 pounds per square inch less than its maximum permissible inflation pressure.

(2) Condition the tire-rim assembly at an ambient temperature of 105° F. for 3 hours.

(3) Adjust the pressure again to 2 pounds per square inch less than the maximum permissible inflation pressure.

(4) Mount the tire-rim assembly on an axle, and press the tire tread against the surface of a flat-faced steel test wheel that is 67.23 inches in diameter and at least as wide as the section width of the tire.

(5) During the test, including the pressure measurements specified in paragraph (g)(1) and (g)(3) of this section, maintain the temperature of the ambient air, as measured 12 inches from the edge of the rim flange at any point on the circumference on either side of the tire, at 105° F. Locate the temperature sensor so that its readings are not affected by heat radiation, drafts, variations in the temperature of the surrounding air, or guards or other devices.

(6) Press the tire against the test wheel at the load specified in Appendix A of

§ 571.109 of this chapter (Motor Vehicle Safety Standard No. 109) for the tire's size designation and the inflation pressure that is 8 pounds per square inch less than the tire's maximum permissible inflation pressure.

(7) Rotate the test wheel at 250 rpm for 2 hours.

(8) Remove the load, allow the tire to cool to 105° F. or for 2 hours, whichever occurs last, and readjust the inflation pressure to 2 pounds per square inch less than the tire's maximum permissible inflation pressure.

(9) Reapply the load and without interruption or readjustment of inflation pressure, rotate the test wheel at 375 rpm for 30 minutes, and then at successively higher rates in 25 rpm increments, each for 30 minutes, until the tire has run at 575 rpm for 30 minutes, or to failure, whichever occurs first.

Figure 1

FIGURE 2—DOT QUALITY GRADES

ALL PASSENGER CAR TIRES MUST CONFORM TO FEDERAL SAFETY REQUIREMENTS IN ADDITION TO THESE GRADES

*Treadwear*

The treadwear grade is a comparative rating based on the wear rate of the tire when tested under controlled conditions on a specified government test course. For example, a tire graded 200 would wear twice as well on the government course as a tire graded 100. The relative performance of tires depends upon the actual conditions of their use, however, and may depart significantly from the norm due to variations in driving habits, service practices, and differences in road characteristics and climate.

*Traction ***, *, and 0*

The traction grades are ** (the highest),*, and 0, and represent the tire's ability to stop on wet pavements as measured on asphalt and concrete test surfaces. A tire marked 0 for traction may have poor traction performance.

*Temperature: A, B, and C*

The temperature grades are A (the highest), B, and C, representing the tire's resistance to the generation of heat and its ability to dissipate heat. Sustained high temperature can cause the material of the tire to degenerate and reduce tire life, and excessive temperature can lead to sudden tire failure. The grade C corresponds to a level of performance which all passenger car tires must meet under the Federal motor vehicle safety standards. Grades B and A represent higher levels of performance than the minimum required by law.

## APPENDIX A–TREADWEAR TEST COURSE AND DRIVING PROCEDURES

*Introduction.* The test course consists of three loops of a total of 400 miles in the geographical vicinity of Goodfellow AFB, San Angelo, Texas.

The first loop runs south 143 miles through the cities of Eldorado, Sonora, and Juno, Texas, to the Camp Hudson Historical Marker, and returns by the same route.

The second loop runs east over Farm and Ranch Roads (FM) and returns to its starting point.

The third loop runs northwest to Water Valley, northeast toward Robert Lee and returns via Texas 208 to the vicinity of Goodfellow AFB.

*Route.* The route is shown in Figure 3. The table identifies key points by number. These numbers are encircled in Figure 3 and in parentheses in the descriptive material that follows.

*Southern Loop.* The course begins at the intersection (1) of Ft. McKavitt Road and Paint Rock Road (FM388) at the northwest corner of Goodfellow AFB.

Drive east via FM 388 to junction with Loop Road 306 (2). Turn right onto Loop Road 306 and proceed south to junction with US277 (3). Turn onto US277 and proceed south through Eldorado and Sonora (4), continuing on US277 to junction with FM189 (5). Turn right onto FM189 and proceed to junction with Texas 163 (6). Turn left onto Texas 163, proceed south to Camp Hudson Historical Marker (7) and U-turn in highway. Reverse route to junction of Loop Road 306 and FM388 (2).

*Eastern Loop.* From junction of Loop Road 306 and FM388 (2) make right turn onto FM388 and drive east to junction with FM2334 (13). Turn right onto FM2334 and proceed south across FM765 (14) to junction of FM2334 and US87 (15). Make U-turn and return to junction FM388 and Loop Road 306 (2) by the same route.

*Northwestern Loop.* From junction of Loop Road 306 and FM388 (2), make right turn onto Loop Road 306. Proceed onto US277, to junction with FM2105 (8). Turn left onto FM2105 and proceed west to junction with US87 (10). Turn right on US87 and proceed northwest to the junction with FM2034 near the town of Water Valley

(11). Turn right onto FM2034 and proceed north to Texas 208 (12). Turn right onto Texas 208 and proceed south to junction with FM2105 (9). Turn left onto FM2105 and proceed east to junction with US277 (8). Turn right onto US277 and proceed south onto 306 to junction with 388 (2). Turn right onto 388 and proceed to starting point at junction of Ft. McKavitt Road and FM388 (1).

*Driving instructions.* The drivers shall run at posted speed limits throughout the course unless an unsafe condition arises. If such condition arises, the speed should be reduced to the maximum safe operating speed.

*Braking Procedures at S T O P signs.* There are a number of intersections at which stops are required. At each of these intersections a series of signs is placed in a fixed order as follows:

## SIGN LEGEND

Highway Intersection 1000 (or 2000) Feet

STOP AHEAD

Junction XXX

Direction Sign (Mereta—)

STOP or YIELD

*Procedures.* 1. Approach each intersection at posted speed limit.

2. When abreast of the STOP AHEAD sign, apply the brakes so that the vehicle decelerates smoothly to 20 mph when abreast of the direction sign.

3. Come to a complete stop at the STOP sign or behind any vehicle already stopped.

*Key points along treadwear test course approximate mileages, and remarks*

| | | Mileages | Remarks |
|---|---|---|---|
| 1 | Fort McKavitt Rd. and F.M. 388. | 0 | |
| 2 | F.M. 388 and loop 306 | 3 | STOP |
| 3 | Loop 306 and U.S. 277 .. | 10 | |
| 4 | Sonora .. . ........... | 72 | |
| 5 | U.S. 277 and F M. 189 .. | 88 | |
| 6 | F.M. 189 and Texas 163 .. | 124 | |
| 7 | Historical marker (Camp Hudson). | 143 | U-TURN |
| 4 | Sonora ........ .. ... | 214 | |
| 3 | Loop 306 and U.S. 277 | 276 | |
| 2 | F.M. 388 and loop 306 | 283 | |
| 13 | F.M. 388 and F.M. 2334 .. | 290 | STOP |
| 14 | F.M. 2334 and F.M. 765 . | 292 | STOP |
| 15 | F.M. 2334 and U.S. 87 | 295 | STOP/U-TURN |
| 14 | F.M. 2334 and F.M. 765 .. | 298 | STOP |
| 13 | F.M. 388 and F.M. 2334 .. | 300 | STOP |
| 2 | F.M. 388 and loop 306 .. | 307 | STOP |
| 8 | U.S. 277 and F.M. 2105 .. | 313 | |
| 9 | F.M. 2105 and Texas 208 | 317 | STOP |
| 10 | F.M. 2105 and U.S. 87 | 320 | STOP |
| 11 | F.M. 2034 and U.S. 87 . | 338 | |
| 12 | F.M. 2034 and Texas 208 | 362 | STOP |
| 9 | F.M. 2105 and Texas 208 | 387 | |
| 8 | F.M. 2105 and U.S. 277 . | 391 | YIELD |
| 2 | F.M. 388 and loop 306 | 397 | |
| 1 | Fort McKavitt Rd. and F.M. 388. | 400 | |

Figure 3

---

## APPENDIX B–TRACTION SKID PADS

Two skid pads have been laid on an unused runway and taxi strip on Goodfellow AFB. Their location is shown in Figure 4.

The asphalt skid pad is 600 ft. x 60 ft. and is shown in black on the runway in Figure 4. The pad is approached from either end by a 75 ft. ramp followed by 100 ft. of level pavement. This arrangement permits the skid trailers to stabilize before reaching the test area. The approaches are shown on the figure by the hash-marked area.

Figure 4

The concrete pad is 600 ft. x 48 ft. and is on the taxi strip. The approaches to the concrete pad are of the same design as those for the asphalt pads.

A two lane asphalt road has been built to connect the runway and taxi strip. The road is parallel to the northeast-southwest runway at a distance of 100 ft. The curves have superelevation to permit safe exit from the runway at operating speeds.

### APPENDIX C–METHOD OF LEAST SQUARES

The method of least squares is a method of calculation by which it is possible to obtain a reliable estimate of a true physical relationship from a set of data which involve random error. The method may be used to establish a regression line that minimizes the sum of the squares of the deviations of the measured data points from the line. The regression line is consequently described as the line of "best fit" to the data points. It is described in terms of its slope and its "$y$" intercept.

The graph in Figure 5 depicts a regression line calculated using the least squares method from data collected from a hypothetical treadwear test of 6,400 miles, with tread depth measurements made at every 800 miles.

FIGURE 1

In this graph, $(x_j, y_j)$ $[j=0, 1, \ldots 8]$ are the individual data points representing the tread depth measurements (the overall average for the tire with 6 measurements in each tire groove) at the beginning of the test (after break-in) and at the end of each 800-mile segment of the test.

The absolute value of the slope of the regression line is an expression of the mils of tread worn per 1,000 miles, and is calculated by the following formula:

$$ b = 1000 \frac{\left( \sum_{j=0}^{8} x_j y_j - \frac{1}{9} \sum_{j=0}^{8} x_j \sum_{j=0}^{8} y_j \right)}{\sum_{j=0}^{8} x_j^2 - \frac{1}{9} \left( \sum_{j=0}^{8} x_j \right)^2} $$

The "$y$" intercept of the regression line (a) in mils is calculated by the following formula:

$$ a = \frac{1}{9} \sum_{j=0}^{8} y_j - \frac{b}{9000} \sum_{j=0}^{8} x_j $$

(Secs, 103, 112, 119, 201, 203; Pub. L. 89–563, 80 Stat. 718 (15 U.S.C. 1392, 1401, 1407, 1421, 1423); delegation of authority at 49 CFR 1.51.) [40 FR 23077, May 28, 1975, as amended at 40 FR 28071, July 3, 1975]

EFFECTIVE DATE NOTE: For all requirements other than the molding requirement of paragraph (d)(1)(i)(A): January 1, 1976, for radial ply tires; July 1, 1976, for bias-belted tires; January 1, 1977, for bias ply tires. For paragraph (d)(1)(i)(A): July 1, 1976, for radial ply tires; January 1, 1977, for bias-belted tires; July 1, 1977, for bias-ply tires.

---

## APPENDIX B

### Excerpts from INFLATION IMPACT REVIEW—UNIFORM TIRE QUALITY GRADE STANDARD

4. a. Cost Effects

(1) *Cost impact on consumers, businesses, markets, or Federal, State, or local government.*

*NHTSA Cost Analysis*—Annual Gross Cost for Implementation of UTQGS.

1. There is a maximum of 1,800 tire lines (based upon NHTSA survey, and confirmed by industry comments).

2. Ten tire sizes per line is an average estimate.

3. Of the ten sizes per line available, it is estimated that 4 tire sizes per line will actually be tested for treadwear and values for the other sizes will be extrapolated from those obtained for the 4 measured sizes.

4. The rule provides for an implementation schedule of 18 months for grading all tire types.

$$1,800 \times 4 = 4,800 \text{ candidate tire line tests}$$
for treadwear per year, during 1½ yrs. implementation period

Note: Based upon normal tire design cycle changes, it is estimated that tires will require retesting for treadwear every 3 years. In other words, while 4,800 candidate tire lines are tested during the first year, the average will stabilize at 2,400 per year.

5. The UTQGS regulation specifies testing 2 tires of each candidate type. However, in order to amass a larger data base, we will assume each manufacturer tests 4 tires of each candidate type (i. e., we are assuming a larger amount of testing and test cost, by a factor of 2:1, over that specified, resulting in more pessimistic cost figures).

6. Treadwear test uses a 4-car convoy—1 vehicle equipped with course monitoring tires, plus 3 vehicles equipped with candidate tires. Hence, based on assumptions above, there will be 4,800 vehicles/yr. testing candidate tires and 1,600 vehicles/yr. testing course monitoring tires during the implementation period. Hence, treadwear testing will use a maximum of 6,400 vehicles per year.

7. Length of treadwear test prescribed in rule equals 6,400 miles plus 800 miles break-in, or a total mileage of 7,200.

7,200 miles x 6,400 vehicles = 46,000,000 vehicle-miles per year

8. Cost of treadwear testing—$0.33 per vehicle-mile. This is based upon the most recent contractor test costs at San Angelo, Texas.

9. Total maximum annual cost of treadwear testing = $0.33 x 46,000,000 equals $15.2 million.

10. Estimated cost of tires:
4,800 candidate test vehicles
x 4 tires/veh. x $20/tire = $384,000
1,600 course monitoring vehicles
x 4 tires/veh. x $40/tire = $256,000
Total tire cost—treadwear $640,000

11. Total cost—Treadwear
$15.2M + $0.6M = $15.8M

12. Cost of Traction testing
1,800 tire lines x 10 sizes/line
x $5/test = $ 90,000
Cost of tires = 18,000
x $20/tire = 360,000
Total $450,000

13. UTQGS total test cost
(traction + treadwear)
= $15.8M + 0.5M = $16.3M

14. Cost per tire manufactured
(200M per year)
= $16.3M =
$16.3M
200M
8 cents/tire—Direct cost
Add 8 cents/tire—Overhead & Markup

15. Estimated cost of labeling
= 5 cents/tire—includes markup

Total gross cost
= 21 cents/tire—maximum

At 21 cents per tire, the total gross cost to consumers and businesses is $0.21 x 200M = $42M per year. Hence,

**1204**

UTQGS does not qualify as a major proposal and an inflationary impact statement is not required.

ENGEL, Circuit Judge (concurring).

I refrain from joining those portions of the opinion touching on the delay in promulgation of the rule, not from any particular disagreement with them, but from uncertainty where blame ought finally to rest, if anywhere. So much is clear from the record: the issue has been complex and difficult for the Congress, for the agency, for the industry, and finally, for us. In all other respects, however, I fully concur in Judge Edwards' well-reasoned opinion.